Justine Wise Polish, J.
On October 28, 1958, Stanley and Bernice Skipwith were cited as respondents in a petition filed by the Board of Education charging them with neglect of their daughter, Charlene, a 12-year-old girl. The petition alleged that the child was without proper guardianship in that her parents, “ refuse to send the child to Junior High School 136 or private school meeting the requirements of the Board of Education law.”
The 33 days of absence between September 8, 1958, and October 27, 1958, were stipulated to be correct by both sides, and the respondents did not offer substitute private schooling as a defense.
On October 29, 1958, Charles and Shirley Rector were likewise cited as respondents in regard to their son, Sheldon, a 12-year-old boy who had failed to attend Junior High School No. 139. Here, too, by stipulation of counsel for the respondents that the reasons of the parents for refusing to send their son to Junior High School No. 139 were identical with those given by the parents of Charlene Skipwith. It was stipulated that should the court, over the objection of counsel for the Board of Education, consider the evidence submitted concerning the alleged inferiority of the school to which the Skipwith child had been assigned, the record in the Skipwith case should be regarded and treated as if testified to in the Rector case, and that the two cases should be consolidated, since the issues presented were identical.
The parents frankly acknowledge that they have refused to send their children to Junior High Schools Nos. 136 and 139, and do not claim either the physical or mental inability of their children to attend school as a reason for nonattendance. They do not.offer evidence of substitute teaching in compliance with the law as a defense, although they have in fact arranged for some private tutoring- of their children.
The parents assert, in justification of their refusal to send their children to these two schools, that both schools offer educationally inferior opportunities as compared to the opportunities offered in schools of this city whose pupil population is largely white. This inferiority of educational opportunities, *327 they assert, results from two conditions which they allege exist in these schools and for the existence of which conditions they claim the Board of Education is responsible. One of the alleged conditions is de facto racial segregation in these two schools all of whose pupils are either Negro or Puerto Bican. The other alleged condition is the discriminatory teacher staffing of these two schools with personnel having inferior qualifications to those possessed by teachers in junior high schools in New York City, whose pupil population is largely white.
As a consequence of the situation alleged to exist in these two schools, it is claimed that the children attending them are denied equal educational opportunities in violation of the “ equal protection of the laws ” guaranteed by the Fourteenth Amendment to the Constitution of the United States. Additionally, it is urged that for this court to compel these parents to send their children to schools offering such unequal educational opportunities would be a further violation of equal protection of the laws.
The Board of Education contends that these constitutional objections are not properly before this court but must be addressed to the Commissioner of Education under section 310 of the Education Law. In the view of the Board of Education, the only defense open to the respondents before this court is that absence of the children from attending school is due to illness or that the parent has made provision of education elsewhere, which meets the requirements of the Education Law.
These proceedings are based upon subdivision (17) of section 2 and subdivision 1 of section 61 of the Domestic Belations Court Act of the City of New York. The latter section gives the court exclusive jurisdiction to hear all cases involving children under the age of 16 years who are alleged to be “ neglected Section 2 provides that “ Neglected child means a child under sixteen years of age * * * who is unlawfully kept out of school. ’ ’[1]
*328 If this court adjudicates a child to be neglected, section 83 of the Domestic Relations Court Act provides that the judgment of this court may:
* * *
“(b) Place the child * * * under supervision to remain in its own home or in the custody of a relative or other fit person, subject, however * * * to the further orders of the court;
“ (c) Commit the child to the care and custody of a suitable institution maintained by the state or a subdivision thereof, or to the care and custody of a duly authorized association, agency, society or institution * * * ;
# #
“ (f) Render such other and further judgment or make such other order or commitment as the court may be authorized by law to make.”
* * *
This broad grant of powers was further enlarged by the addition of subdivision (i) to section 83 by chapter 949 of the Laws of 1956. This provides that, upon an adjudication of neglect, the court may, if it appears that the conduct of the parents “has contributed” to such neglect, “issue a written order specifying conduct to be followed by such parent * * * with respect to such child.” The only guide provided by subdivision (i) for such order is that: “ The conduct specified shall be such as would reasonably prevent * * * neglect as defined by statute.” Subdivision (i) further provides that: “ Such order shall remain in effect for a period of not more than one year to be specified by the court and said order may be extended or reviewed by the court.” Sanctions of the most drastic character are specified to assure compliance with such an order. Thus, subdivision (i) of section 83 concludes with the following provisions: ‘ ‘ Willful violation of any provision of such order shall constitute criminal contempt out of presence of the court. The persons so charged shall be notified of the accusation and have a reasonable time to make a defense. The trial of such proceeding shall take place before a judge other than the one who issued the written order. Punishment for such contempt may be by fine, not exceeding two hundred and fifty dollars, or by imprisonment, not exceeding thirty days, in the jail of the county where the court is sitting, or both, in the discretion of the court. When a person is committed to jail for the non-payment of such fine, he shall be discharged at the expiration of thirty days; but where he is also committed for a definite time, the thirty days shall be computed from the expiration of the definite time.”
*329 If these children are adjudicated neglected because of their parents’ refusal to send them to the schools in question, and their parents thereafter persist in such refusal, the appropriate action by this court might well be to issue a written order specifying that the children be sent to these schools. If such an order were disobeyed, these parents would be subject to a heavy fine or imprisonment, or both.
Subdivision (i) provides that: “The judge before issuing any such order shall advise such parent, guardian or other person of his right to have the reasonableness immediately reviewed, and in this connection the supreme court is vested with jurisdiction to summarily determine the reasonableness or any question of law or fact relating to such written specifications and make such order as justice may require.”1a
It would seem, however, that this review would be of no avail to these parents since an order requiring them to send their children to these schools would clearly be such as would be reasonably necessary to prevent the repetition of the very same neglect originally committed. Moreover, the review provided in subdivision (i) of section 83 would be entirely unavailable if this court were to commit these children to an institution in order to assure their attendance at a public school or a school which meets the requirements of the Board of Education.
In sum, the Board of Education urges that these children may be taken from their families by this court, and their parents may be fined and imprisoned for refusing to send them to public schools which, it is charged, are conducted in violation of the Constitution of the United States, and that this court has no power to consider such charge.
In other words, the Board of Education contends that one arm of the State — this court — must blindly enforce the unconstitutional denial of constitutional rights by another arm of the State — the Board of Education. Such a proposition is abhorrent to the American doctrine of supremacy of the law. It is utterly shocking to the conscience of a Justice of a Children’s Court established to promote the health and welfare of children. Only the clearest of legislative mandates or the plainest of judicial precedents would compel this court to such a holding. None do so. The holdings of the courts of this State are to the exactly opposite effect, and the decisions of the Supreme Court of the United States are clear that any other holding would itself deny the due process of law also guaranteed by the Fourteenth Amendment.
*330 The cases cited by the Board of Education do not support its argument that this court has no power to consider the defenses on constitutional grounds offered by these parents. Indeed, none of them involved constitutional issues. Moreover, other cases decided by the courts of this State hold, again and again, that not only constitutional rights, but statutory and even common-law rights, may be vindicated as against boards of education without prior resort to the Commissioner of Education.
People v. Himmanen (108 Misc. 275), cited by the Board of Education, involved a criminal prosecution against a parent for failure to send his children to school. He defended on the ground that distance from his home was so great and the roads so bad that it was unreasonable to require him to send his children to school after the school bus service was discontinued. A jury in the Magistrates’ Courts found against the parent on the facts and he appealed to the County Court on the ground of errors in the admission of evidence. The County Court ruled that any errors in evidential rulings were immaterial because, in its view, the only defense under the Education Law was that the children were 1 ‘ not in proper physical and mental condition to attend school ” (p. 277).
People v. Himmanen did not give any consideration to whether an appeal to the Commissioner of Education was the appropriate remedy for the parent. Nor was the point considered in a similar case decided by the Children’s Court of Nassau County (Matter of Conlin, 130 N. Y. S. 2d 811, also relied upon by the Board of Education).[2]
In Matter of Myers (203 Misc. 549) this court declined to rule upon the defense offered in a neglect proceeding that the school to which a child had been originally assigned was hazardous for the child to attend because of unsanitary conditions. In the Myers case, the charge of neglect was dismissed since it was affirmatively shown that the child was receiving the required amount of instruction at home prescribed by her grade and, further, that the Board of Education had offered to transfer the child to attend a school in an adjoining district against *331 which the parents had no objection except on the grounds of personal preference for still another school. It was not urged before me in the Myers case that this court could not consider the parents’ objection because they had not sought review by the Commissioner of Education.
Matter of Richards (166 Misc. 359, affd. 255 App. Div. 922), the Board of Education urges, went off on the point that nonattendance of the child was excused for health reasons. However, I do not so read the decision of the Appellate Division affirming the order of the Children’s Court which dismissed a neglect petition brought by a truant officer. The unanimous Per Curiam opinion was as follows: “ Appeal from an order of the Chenango County Children’s Court, which dismissed proceedings brought by the truant officer of the town of Oxford. The petition asked that the mother of a child eight years of age be punished for failing to send the child to school. It was one and a quarter miles from the home of the defendant to the place where the school bus passed. The road was lonely, poorly cared for, unfenced. The judge of the Children’s Court found as a fact that it was not unreasonable to refuse to permit this child, of a tender age, to walk this distance along a lonely and poorly kept road. The mother taught the child at home, which she was competent to do. The order of the Children’s Court should be affirmed. Order unanimously affirmed, with costs and disbursements of this appeal.” It is significant, I believe, that the Appellate Division chose not to rest its affirmance solely upon the ground that the mother of the child was providing adequate education at home.
De Lease v. Nolan (185 App. Div. 82), cited by the Board of Education, has no possible bearing upon the authority of this court to consider the defense offered in this case. That case involved a civil suit for trespass brought against an attendance officer who had entered a home to arrest a truant, without a warrant, under the authority of what was then section 633 and is now 3213 of the Education Law. No excuse for the child’s nonattendance was offered other than that it was with his mother’s consent. Manifestly, the case had nothing to do with the necessity for an appeal to the Commissioner of Education and no reference is made in the opinion of the Appellate Division to any such point.
Matter of Weberman (198 Misc. 1055, affd. 278 App. Div. 656, affd. 302 N. Y. 855) involved a habeas corpus proceeding instituted by the mother against her former husband to obtain custody Of their son on the ground that the father was sending the boy to a religious school which did not meet the require- *332 meats of the Education Law. The father defended on the ground that to sustain the writ would be to violate his religious freedom in violation of the First and Fourteenth Amendments to the Constitution. The defense was considered and overruled on the merits. Nowhere in the opinion of the court is there any reference to the necessity of resort to an appeal to the Commissioner of Education.
Although not cited by the Board of Education, a case even more closely in point (though adverse to the position of the board) is People v. Bonner (199 Misc. 643, affd. 278 App. Div. 705, affd. 302 N. Y. 857, appeal dismissed sub worn, Bonner v. New York on Complaint of Silverman, 342 U. S. 884). The Bowner case involved a prosecution in this court for failure to send a boy to a qualified school.[3] The father defended on the ground that to compel him to remove the child from a religious school would violate his constitutional rights, even though the religious school did not meet the educational standards specified by the Education Law. Here again, as in Matter of Weber-man (supra) the defense was considered and overruled on the merits.
It would unduly lengthen this opinion to cite all the instances in which the Board of Education has sought, without success, to persuade the courts of this State that a person aggrieved by its conduct must seek the remedy of an appeal to the Commissioner of Education. Illustrative cases are Matter of Frankie v. Board of Educ. of City of N. Y. (173 Misc. 1050, mod. 259 App. Div. 1006, affd. 285 N. Y. 541) (failure to make mandatory appointments of eligible teachers to fill vacancies); Matter of Bonis v. Board of Educ. of City of N. Y. (263 App. Div. 369, mod. 288 N. Y. 330) (same); Matter of Sokolove v. Board of Educ. of City of N. Y. (176 Misc. 1016) (same); Matter of Jacobson v. Board of Educ. of City of.N. Y. (177 Misc. 809, mod. 265 App. Div. 837, motion for leave to appeal denied 265 App. Div. 935); Cottrell v. Board of Educ. of City of N. Y. (181 Misc. 645, affd. 267 App. Div. 817, affd. 293 N. Y. 792) (reduction of teachers’ salaries fixed by schedules filed with Commissioner of Education).
While the cases cited in the preceding paragraph involved teachers rather than pupils (and their parents), it goes without saying that the courts of this State are open equally to both in order to establish and defend their legal rights. What is significant in those cases obviously is not the personality of the aggrieved person, but rather it is that the rights vindicated *333 were statutory in origin (i.e., based on the Education Law) or rested upon the civil service provisions (art. V, § 6) of the Constitution of New York. These, of course, are lower in the hierachy of values than the fundamental rights guaranteed by the Fourteenth Amendment.
One other case involving an action by a teacher deserves special mention. In Matter of Moses v. Board of Educ. of City of Syracuse (127 Misc. 477, affd. 218 App. Div. 811, revd. on other grounds 245 N. Y. 106) a woman teacher brought an action for mandamus to set aside salary schedules on the ground that they discriminated in favor of male teachers in violation of the then recent amendment to the Education Law. Both the Supreme Court and the Appellate Division rejected the contention that the teacher’s sole remedy was an appeal to the Commissioner of Education. The Court of Appeals reversed on the ground that the teacher failed to establish the alleged discrimination. The court, which included such judicial statesmen as Cardozo, Pound and Lehman, would hardly have passed over without mention the claim of exclusive administrative remedy, if the assertion had even merited consideration.
Nor has the protection of direct judicial review of acts of boards of education been afforded only to those in the teaching role.
Thus, in Cannon v. Towner (188 Misc. 955) it was held that an action would lie to restrain the Board of Education of the City of Albany from revoking a permit to use the public school building for a musical concert by Paul Robeson. Special Term, after holding that while the granting of the license was a discretionary act, ruled that no such discretion existed so far as revocation of the license was concerned. Moreover, the court said (p. 961), the provision of the Education Law for an appeal to the Commissioner of Education. 6 ‘ is permissive and not mandatory ’ ’ and “ it is not the exclusive remedy of an aggrieved person.”
Even more pertinent to the present case is Ellis v. Dixon (118 N. Y. S. 2d 815, affd. on other grounds 281 App. Div. 987). In that case, a proceeding was brought under article 78 of the Civil Practice Act for an order directing the Board of Education of the City of Yonkers to permit the Yonkers Committee for Peace to use a school house in the City of Yonkers. Special Term ruled (p. 818) that, “Where, as here, the denial of permission to use a schoolhouse involved the exercise of a discretionary power by the respondent-Board of Education, it is the opinion of this court that an appeal to the Commissioner of Education is-the exclusive remedy of petitioner.” On appeal, the Appel *334 late Division affirmed on the merits but expressly overruled the jurisdictional objection which Special Term had sustained. Said the Appellate Division (pp. 987-988): “ The proceeding was properly before the court. However, the petition does not allege facts which establish a clear legal right to the relief sought nor which establish that respondents failed to perform a duty enjoined by law.”
In sum, the New York courts hold that section 310 of the Education Law is no bar to a judicial determination of whether a board of education has violated legal rights, whatever their origin, and that even where a board of education has acted in the exercise of discretion, the courts are available to determine whether such discretion has been exercised in an illegal manner. No other ruling would be compatible with the principle — that ours is a government of laws and not of men — which is the keystone of our American liberties. Indeed, the Supreme Court of the United States has held that it would be a denial of due process of law if administrative action immediately affecting the liberties of an individual were placed beyond judicial scrutiny when the government sought to punish him for disobedience of such administrative command. (See Estep v. United States, 327 U. S. 114, 122, 127, 133.)
It may be noted that the Supreme Court of Virginia has held that the compulsory education law of that State may not be invoked to punish Negro parents for refusal to send their children to a segregated school. ( Dobbins v. Commonwealth, 198 Va. 697, 699.) As the Supreme Court of Virginia said, compulsory education laws ‘ ‘ cannot be applied as a coercive means to require a citizen to forego or relinquish his constitutional rights.” One must experience regret that the Board of Education of the City of New York should suggest that the courts of this State be less solicitous of the rights of its citizens.
The issue here involved goes even deeper than is made explicit in Dobbins v. Commonwealth. It is the Board of Education, and not these parents, who have invoked the power of this court. This is not a situation in which parents of children seek a court order directing the Board of Education to remedy allegedly unconstitutional educational conditions in the schools. Even if such were the case, a court having jurisdiction of such matter might well hold, in the light of the recent decision of the Supreme Court in the Little Rock case (Cooper v. Aaron, 358 U. S. 1, 7) that in the City of New York “ all deliberate speed ” in remedying such conditions requires action instanter. Here, however, there is not the question of how speedily the Board of Education should be called upon to end unconstitutional dis *335 crimination, if such be found to exist. For here it is the Board of Education which asks that this court now lend its sanction to the alleged unconstitutional mandate of the board. This, as the restrictive covenant cases teach, no court may do without violating the Constitution. (Shelley v. Kraemer, 334 U. S. 1; Barrows v. Jackson, 346 U. S. 249.)
This court, I conclude, has the duty to consider upon the merits the constitutional issues presented by these parents in defense of their conduct[4] and, if the defense is sustained by the facts, this court must dismiss the proceeding against them.
Tables prepared for this hearing by the Board of Education show the following:
The two schools to which the children in these cases were assigned are the only junior high schools in the City of Netv York whose student population is 100% Negro and Puerto Rican. Junior High School No. 136 has 1,560 (98.4%) Negro children and 25 (1.6%) Puerto Rican children. Junior High School No. 139 has 1,629 (98.5%) Negro children and 25 (1.5%) Puerto Rican children.
There are seven additional junior high schools in New York City in which the student population is over 95% Negro and Puerto Rican. In 40 junior high schools, the student population is over 95% white, described by the Board of Education as ‘ ‘ other ’ ’ in the tables submitted by it.
Also revealing is the information contained in these tables as to “ X ” schools and “ Y ” schools.[5] The term “ X ” school is used to describe a school with a Negro and Puerto Rican population of 85% or more; and the term “ Y ” school is used to designate a school with a Negro and Puerto Rican population of less than 15%. The tables prepared by the Board of Educa *336 tion for this hearing show that, among the 127 junior high schools in New York City, there are 16 “ X ” schools and 52 “Y” schools.
From the foregoing, the conclusion must be drawn that de facto racial segregation exists in the junior high schools of New York City. This confirms what is a matter of common knowledge. What the record in this case does not show is to what extent, if any, such segregation is the consequence of circumstances other than residential segregation not attributable to any governmental action. There is no evidence before the court that the racial composition of junior high schools in New York is the product of gerrymandering of school districts, or of any policy or lack of policy of the Board of Education in establishing school districts, or in choosing school sites, or in assigning pupils to schools on the basis of race. Upon the record in this case, the court holds that no showing has been made that de facto segregation in New York City is the consequence of any misfeasance or nonfeasance of the Board of Education. So far as the respondents rest their defense upon that ground, their refusal to send their children to Junior High Schools Nos. 136 and 139 is not justified. (Cf. Henry v. Godsell, 165 F. Supp. 87; Holland v. Board of Public Instruction, 258 F. 2d 730.)[6]
I turn now to alleged discrimination in the staffing of “ X ” schools, with the alleged result that schools attended predominantly by Negro and Puerto Bican children are taught by less qualified teachers and, hence, enjoy inferior education advantages. Before summarizing the evidence on that point, however, it is important to note that if such is the situation, a terrible injustice is done to children who already have to suffer the blighting effect of segregation.
Preliminary to the adoption on December 23, 1954, of the resolution directing the establishment of the Commission on Integration,[7] the Board of Education declared that: “ The Supreme Court of the United States [in Brown v. Board of *337 Education, 347 U. S. 483] reminds us that modern psychological knowledge indicates clearly that segregated, racially homogeneous schools damage the personality of minority group children. These schools decrease their motivation and thus impair their ability to learn. White children are also damaged. Public education in a racially homogeneous setting is socially unrealistic and blocks the attainment of the goals of democratic education, whether this segregation occurs by law or by fact.”
As was said in the Report of the Commission on Integration, submitted June 13, 1958: “ Whether school segregation is the effect of law and custom as in the South, or has roots in residential segregation, as in Mew York City, its defects are inherent and incurable. In education there can be no such thing as ‘ separate but equal. ’ Educationally, as well as morally and socially, the only remedy for the segregated school is its desegregation.”
This declaration was indorsed by Dr. Wayne B. Wrightstone, distinguished educator, psychologist, social scientist, and director of the Bureau of Research of the Board of Education who was called as a witness by the respondents. On the basis of his own research, Dr. Wrightstone testified that the following were, in his opinion, the major factors which affect the achievement level of students: Inherited characteristics; nutritional and other factors present before and after birth of a child; environmental factors including stimulating academic environmental factors in the home and the community; aspiration level of the individual and his parents; amount of schooling attained by parents; instruction or teaching. Dr. Wrightstone acknowledged that there was less deviation in I. Q. tests of children in the “ X ” and “ Y ” schools before they reached the fourth grade, where verbal content began to be stressed. He also testified that the studies made by his department showed that there was a widening spread in I. Q. tests between children in “ X ” and “Y” schools as they proceeded in their respective schools.
Dr. Kenneth B. Clark, another distinguished psychologist, educator and social scientist,[8] **and a member of the commission of the Board of Education, who also served on the Subcommission on Educational Standards and Curriculum, was called by the respondents as an expert witness. He agreed with Dr. Wrightstone that the way in which a child learns was a complex and subtle problem. However, he placed greater emphasis on the role of the school in the learning process. According to Dr. Clark: 11 The most objective observable factor *338 is the learning situation itself, the school, the teachers, the opportunities which children have to learn, the conditions under which they are required to learn, the factors which overtly or subtly influence their motivation * * * the school plays a very important role in motivating a child to learn. ’ ’
In answer to the question of whether the composition of the school population would in his opinion have any substantial effect on either the learning process or the motivation to learn, Dr. Clark testified:
“ It is my considered judgment and opinion, as a consequence of extensive study of segregation in schools, both in those regions of the country where segregated schools were maintained previously by law and in regions of the country where segregation in schools exists as a consequence of residential segregation or mores, that the segregated school and the general characteristics usually found associated with segregated schools depress the ability of children to learn, as reflected in low achievement scores, in low IQ scores, to the extent that these IQ scores are the result of what the child has or has not been taught * * *
“ I certainly agree with Dr. Wrightstone that the factors and the problems involved in the achievement of a child, or educational achievement of a child, are complex and subtle. I think, among the complex and subtle factors, is the child’s estimate of what other people think of him and how he is treated and what is expected of him.
“ It is my judgment, from experience, observation and study of the debilitating effect of segregated schools • — it is my personal judgment that subtle attitudinal factors may be as important, if not more important, than the more measurable, concrete deficiencies which are usually found associated with segregated schools ”.
The record in this case fully sustains the contention that the separation of children by race, whether it be the result of governmental action or of private housing segregation, creates factors inimical to the full and equal educational opportunities. Further, as pointed out by both Dr. Wrightstone and Dr. Clark, the quality of teaching is still another vital factor in determining the adequacy of education. Indeed, it is a truism that the more the child is disadvantaged by other factors, the greater the need of the child for skillful teaching. Certainly it is fatuous to make declarations regarding the educational handicaps imposed upon a child by being in a segregated school and not to take reasonable measures to assure that such child is given teachers at least equal in qualifications to those not so *339 disadvantaged. Yet such is the case in the public school system of New York.
The Principal of Junior High School No. 136 was called as a witness by the respondents. The court was deeply impressed by his sincere devotion to the welfare of the children in his school and by his efforts to secure a staff sufficient in number and adequate in skill. That he failed in his endeavor was, in the opinion of the court, inevitable in view of the default of the Board of Education.
The following facts were developed through the testimony of the Principal of Junior High School No. 136. Under the stipulation of the parties, they will be treated as also applying to Junior High School No. 139.
Junior High School No. 136 has 1,560 students. There are 85 teachers, including the guidance counselor, of whom 42 are regularly licensed. The 43 academic vacancies[9] are filled by substitutes. Substitutes, unlike regularly licensed teachers, are not assigned by the Board of Education, but must be secured by the Principal personally, through advertising, interviews, and other individual efforts.
Of the six teaching positions in the science department, three are filled by teachers regularly licensed to teach science by the Board of Education. One is licensed as a substitute social science teacher. Another is a regularly licensed common branch teacher, i.e., a teacher licensed to teach all subjects in the first through sixth grades, but not to teach a specific subject in a junior high school.
Only 2 of the 11 teaching positions in the mathematics department are filled by teachers regularly licensed to teach mathematics by the Board of Education. One has a regular license to teach business subjects. Two are licensed as substitutes to teach mathematics. Two are licensed as substitutes to teach foreign languages, and two are licensed as substitutes to teach social studies.
In social studies, fine arts and foreign languages departments, the proportion of regularly licensed teachers is far better.
The Assistant Superintendent in charge of personnel for the junior high school division, called as a witness by the respondent, testified to the tremendous dearth of regularly licensed teachers available for junior high schools throughout the city. Thirty-four per cent of the teaching positions throughout the junior high schools are now listed as vacancies, which means that they are being filled by substitutes. In answer to a ques *340 tion, this witness testified that ‘‘ There is a shortage of teachers and, particularly, a shortage of teachers in the Junior High Schools, so no matter what we do is spreading poverty. ’ ’ However, the tables which the Board of Education subsequently prepared at the request of the court shows that the ‘ ‘ poverty ’ ’ is by no means evenly spread among the junior high schools of New York City.
On reading the record, the court was satisfied that in order to reach a conclusion as to whether the assignment of school personnel constituted evidence of substantial discrimination, unequal educational opportunities, and a violation of constitutional rights, fuller evidence on this question was needed. At the request of the court, further evidence was submitted by the Board of Education in the form of tables which included the names and addresses of the 127 junior high schools of New York City, the ethnic composition of the student bodies in each such school and, as of September 11, 1958, the number of regularly licensed teachers working in each such school, and the number of academic vacancies as of that date. They also included a list identifying those schools which have been designated by the Board of Education as in need of special services. The board has requested the court not to publish the identity of those schools listed, lest its publication injuriously affect the children attending them. For the purpose of this opinion, it is sufficient to state that the vast majority of “X” schools, including Junior High Schools Nos. 136 and 139, were included in this group.
Analysis of the data submitted on teacher assignment shows a city-wide pattern of discrimination against “ X ” junior high schools (which have 85% or more Negro and Puerto Bican students) as compared to “ Y ” schools (which have 85% or more white students): A far greater percentage of positions in the “ X ” schools were not filled by regularly licensed teachers.
As I have already noted, positions not filled by regularly licensed teachers, the “ academic vacancies ”, must be filled by substitutes secured through the individual efforts of the principals. The educational requirements for a regularly licensed teacher are substantially higher than for a substitute teacher.[10] Thirty hours of graduate courses are required of regularly licensed teachers of general subjects, but none are required of *341 substitutes. For both teachers of general and special subjects, the number of required hours in approved courses are higher for regularly licensed teachers than for substitutes.
As of September 11,1958, the average percentage of vacancies in the “X” schools (over 85% Negro and Puerto Bican students) was 49.5%, while the average percentage of vacancies in the “ Y ” schools (over 85% white students) was 29.6%. In the two schools to which the children of the respondents were assigned, there were over 50% vacancies in one and 51% vacancies in the other. The following is a summary of the present situation:
Vacancies in “X” and “7 ” Schools[11]
“X” Schools e( y » Schools No. of No. of Borough Schools % Schools % Manhattan 7 48.8 2 28 Brooklyn 3 55.0 22 31.6 Queens 2 33.0 18 27.8 Bronx 4 55,0 10 29.0 Total 16 49.5 52 29.6
While the Board of Education introduced some evidence tending to show that some steps had been taken to improve the teaching and program at Junior High School No. 136, no evidence was submitted to show that the board had adopted any procedure under which correction of the discriminatory imbalance between regularly licensed and substitute teachers could be reasonably anticipated.
The Assistant Superintendent in charge of personnel in the junior high school division testified that the Board of Education had given her no power to transfer regularly licensed teachers once appointed. The Principal of Junior High School No. 136 testified that only one regularly licensed teacher had transferred voluntarily to his school. Thus, despite the high percentage of substitutes in the mathematics department, and *342 despite an appeal by the principal for more regularly licensed teachers in this field, the disproportionately high percentage of substitutes at Junior High School No. 136 has remained practically unchanged.
The steps taken to improve the teaching at Junior High School No. 136 included an allotment for nine new teaching positions this year, of which five were filled by regularly licensed teachers. The size of classes has thus been reduced. The Assistant Superintendent in charge of curriculum testified that a project to improve the reading level of the students is now under way but admitted that thus far only two remedial teachers have been assigned to the school — this, despite the extremely low median reaching achievement of the students and the fact that in the eighth grade alone 269 children were characterized as slow learners and had a median reading level of two and one-half to three and one-half years below par.
The Assistant Superintendent in charge of personnal testified that projected additional services for Junior High School No. 136, and for those other schools designated as in need of special services, contemplated reduction of class size and improvement of teaching programs.
This Fall, for the first time, the Principal introduced a special progress class for gifted children with I.Q.s of 125 or more.[12] But at present this class exists only in the seventh grade. But neither these limited ameliorative steps, nor the unquestionable devotion of the principal to improving the educational program of Junior High School No. 136, touches the core of the problem.
No amount of individual skill or devotion of school principals can compensate for or eradicate the established pattern of discrimination in the assignment of" regularly licensed teachers, which has grown up over the years despite the fact that as long ago as 1896, the Supreme Court in Plessy v. Ferguson (163 U. S. 537) though sanctioning segregation, held that the Fourteenth Amendment requires “ equal facilities.” It should not have required Brown v. Board of Educ. (347 U. S. 483) in 1954 to alert the Board of Education of the City of New York to its constitutional responsibilities. At least by 1950, when Sweatt v. Painter (339 U. S. 629) was decided by the Supreme *343 Court, there was no excuse for thinking that the Fourteenth Amendment’s constitutional command of “ equal facilities ” in education meant anything less than true equality.
The report of the Commission on Integration itself refers to various elements that cause the quality of education in “I” schools to be inferior: higher percentages of handicapped and retarded children; relatively larger percentages of substitute teachers; higher proportions of inexperienced teachers, all at those very schools where the social and economic conditions of the area and the problems of the children require a more experienced, stable and capable staff to meet the problems of the children. The evidence submitted shows that the two schools involved in the present case suffer from each of these difficulties to a marked degree.
Moreover, the Report of the Commission on Integration notes that the Subcommission on Teachers Assignment and Personnel[13] “ deems it morally indefensible to allow the continuance of the present unequal staffing of our schools * * * (Our) recommendations are concerned with recognizing, first the right of all children to a fair share of experienced teaching; second, the need for a changed assignment policy that recognizes this right * * * third, the right of children, teachers and supervisors to equal conditions for teaching to the extent to which the school system can provide it.”[14]
It was specifically recommended that teacher assignment should be based on the needs of the schools rather than the preferences of teachers and principals.[15]
So long as nonwhite or “X” schools have a substantially smaller proportion of regularly licensed teachers than white or ‘ ‘ Y ” schools, discrimination and inferior education, apart from that inherent in residential patterns, will continue. The Constitution requires equality, not mere palliatives.
Yet the fact remains that more than eight years after the Supreme Court ruling in Sweatt v. Painter (supra) and more than four years after its ruling in Brown v. Board of Educ. (supra), the Board of Education of the City of New York has done substantially nothing to rectify a situation it should never have allowed to develop, for which it is legally responsible, and with which it has had ample time to come to grips, even in the last four years.
*344 That the Board of Education is entirely responsible for the existing discrimination in teacher assignments, there is,' in my opinion, not the slightest doubt. What the board did was to let the teachers themselves establish the discriminatory pattern. But this was action by the board’s employees, and action by employees who, as regularly licensed teachers, were subject to such assignments as the board chose to make. Having put the power of assignment in the hands of teachers by default, as far as their choosing or not choosing to teach in an “ X ” school — a euphemism which nowise changes the fact of de facto school segregation — the board is bound by the acts of its servants.
Nor is this a question of niceties of the law of agency. The assigning of teachers is the exercise of a governmental function. It is no less the exercise of such a role if performed by teachers, rather than an assistant Superintendent of Education, or the Superintendent of Education, or the board itself. The Board of Education of the City of New York can no more disclaim responsibility for what has occurred in this matter than the State of South Carolina could avoid responsibility for a “ Jim Crow” State Democratic Party which the State did everything possible to render “private” in character and operation. (See Rice v. Elmore, 165 F. 2d 387, cert, denied 333 U. S. 875; see, also, both the majority and dissenting opinions in Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 532-533, 538-542.)
Where, as here, power and responsibility for teacher assignment rests in the Board of Education, teachers who exercise that power are, in the opposite words of Mr. Justice Cardozo,
‘‘ not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions ” (Nixon v. Condon, 286 U. S. 73, 88).
The Board of Education can no more plead not guilty than could the Police Commissioner if he allowed patrolmen to choose not to accept dangerous or unpleasant assignments. No one would suppose that a new Police Commissioner would have performed his duty if he sought to remedy the situation by assigning police rookies to those tasks. Yet, in effect, that is all the Board of Education has done so far, in limiting the exercise of its power of assignment to the assignment of newly licensed teachers to the “ X ” schools.
To recur to a point earlier made, this court is not called upon to decide how soon the Board of Education could be directed to remedy what it has so long tolerated. Nor is it the function *345 of this court to say how the board should go about effecting a change in the present lamentable situation, whether by compulsory assignments of veteran teachers to “X” schools for a period of years, by paying a special bonus to teachers to induce them to accept such assignments, or by providing additional services and facilities in such schools, as, for example, additional administrative personnel, to make them more attractive to teachers now working in less difficult schools.
The courts of this State will not excuse failure of performance of a constitutional duty because the City of New York might be unwilling to pay the bill for the costs of what needs to be done. (Matter of Jaffe v. Board of Educ. of City of N. Y., 265 N. Y. 160; see, also, Matter of O’Reilly v. Grumet, 284 App. Div. 440, affd. 308 N. Y. 351.)[16] Nor will they relieve the Board of Education of its duties because of “ hardship upon the existing teaching force.” (Cf. Matter of Davis v. Board of Educ. of City of N. Y., 263 App. Div. 369, 371, mod. 288 N. Y. 330.) Those are educational problems which it is the business of the board to deal with. Surely, they are less difficult of solution than those problems that have been faced and solved by boards of education — -with the help of the teachers themselves and the encouragement and assistance of community leaders ■ — in cities like Washington, District of Columbia, Baltimore, Maryland and Louisville, Kentucky, which, since Brown v. Board of Educ. (supra) have changed from segregated to desegregated school systems. Here, as there, determination, resourcefulness and leadership can bring the situation in the New York City school system into line with the constitutional guarantee of equal protection of the laws. Until then, the Board of Education has no moral or legal right to ask that this court shall punish parents, or deprive them of custody of their children, for refusal to accept an unconstitutional condition which exists in the schools to which the board has assigned their children.
I hold the defense on grounds of inferior educational opportunities in those schools by reason of racial discrimination to be established and to bar an adjudication of neglect.
These parents have the constitutionally guaranteed right to elect no education for their children rather than to subject them to discriminatorily inferior education. I am wholly satisfied from their testimony and demeanor that this is not a case where parents have chosen to make such a choice without regard to the welfare of their children. On the contrary, it is my impression that they are doing whatever is within their means to provide alternative education, though it may not meet the requirements of the Education Law. In my judgment, the *346 course upon which they embarked, and which brought them before this court, was undertaken for the sake of their children and for the tens of thousands of other children like them who have been unfairly deprived of equal education.
The petitions are dismissed.
APPENDIX Comparative Analysis of Vacancies in 16 “X " and 52 “ Y ” Junior High Schools of New York City[1]

*347

 Section 3205 of the Education Law provides: “ In each school district of the state each minor from seven to sixteen years of age shall attend upon full time day instruction.” The parents’ responsibility for seeing that this instruction is provided is found in section 3212 (sulbd. 2, par. b) which provides that the parent: “ Shall cause such minor to attend upon instruction as herein-before required, and to comply with the provisions of part one of this article with respect to the employment or occupation of minors in any 'business or service whatever.” Paragraph d of subdivision 2 of said section further provides that the parent: “Shall furnish proof that a minor who is not attending upon instruction at a public or parochial school in the city or district where the person in parental relation resides is attending upon required instruction elsewhere. Failure to furnish such proof shall be presumptive evidence that the minor is not attending.”

 Chapter 324 of the Laws of 1957 omitted the prior provision for review, in the alternative, ‘by the County Court and the Court of General Sessions.

 The Conlin ease was a criminal" prosecution pursuant to section 3227 of the Education Law. The Children’s Courts outside of New York City and the Counties of Cortland and Westchester have jurisdiction in such cases under subdivision 7 of section 6 of the Children’s Court Act of the State of New York. The Children’s Courts in New York City and the Counties of Cortland and Westchester have jurisdiction under section 3227 of the Education Law. Section 3228 of the Education Law provides that a violation by a parent of the duty to provide required education “ shall be punishable for the first offense by a fine not exceeding ten dollars, or ten days’ imprisonment; for each subsequent offense by a fine not exceeding fifty dollars, or by imprisonment not exceeding thirty days, or by both such fine and imprisonment.”

The prosecution was under section 3227 of the Education Law, (See n. 2, supra.)

 Accordingly the court now overrules those objectives made by the Board of Education to admission of evidence on this issue and on which decision was reserved at the hearing.

 The “ X ” and “ Y ” appellations have their origin in the Report of the Public Education Association (1955), prepared at the request of the President of the Board of Education and quoted in the Final Report of the Commission on Integration of the Board of Education. The Final Report of the Commission on Integration, submitted to the Board of Education on June 13, 1958, states that Colonel Levitt, then President of the Board of Education, requested the Public Education Association “to conduct a full, impartial and objective inquiry into the status of the public education of the Negro and Puerto Rican children in New York City.” The Public Education Association accepted the task and enlisted the help of the New York University Research Center for Human Relations. The commission’s final report states that the report of the Research Center “ provided a frame of reference ” for the subsequent work of the six subcommissions of the Board of Education’s Commission on Integration whose reports are summarized in the commission’s final report.

 In Henry v. Godsell, de faeto school segregation in Pontiac, Michigan, resulting from the residential pattern of the community, was held not to constitute a denial of equal protection of the laws. However, in Holland v. Board of Public Instruction, the opposite conclusion was reached where the school district in Palm Beach County, Florida, in which the child lived was “ designated by city ordinance as a Negro residential area ” (p 731). In the latter case the Court of Appeals observed that, “In the light of compulsory residential segregation * * * it is wholly unrealistic to assume that the complete segregation existing in the public schools is either voluntary or the incidental result of valid rules not based on race” (p. 732).

 See note 5, supra.

 Dr. Clark was cited by the Supreme Court as a “modem authority” on the “ detrimental effect upon the colored children [of segregation of white and colored children in public schools] ”. (Brown v. Board of Educ., 347 U. S. 483, 494, n. 11.)

 “ Academic vacancies ” or “ vacancies ” is the terminology employed to describe authorized positions not filled by regularly licensed teachers.

 See Board of Education By-Laws, article XII, sections 332-332a. Counsel for Board of Education asked that the court take a judicial notice of the ¡by-laws, and agreed to submit a copy. The copy received will be deemed marked in evidence as the court’s Exhibit No. 6 as of December 5, 1958, the last trial day.

 See Appendix for detailed breakdown within each borough. Data submitted 'by the Board of Education was incomplete as to seven of the 127 junior high schools and they are, therefore, not included in the above table or in the Appendix. The summaries in the Appendices are the result of an analysis of the tables submitted by the Board of Education at the hearing on December 5, 1958. These tables covering all the junior high schools of New York City were admitted in evidence as court’s Exhibits 3 and 5. Exhibit 3 gives the ethnic census of these schools from which the court derived the percentages of “ Negro ” and “ ¡Puerto Rican ” and “ Other ” pupils in each school. Exhibit 5 shows the number of regularly licensed teachers and the number of academic vacancies from which the court derived the percentages of such teachers and vacancies in each school.

 In 1955, 66.7% of the “ Y ” junior high schools had special classes for intellectually gifted children, but there were no such classes in the “ X ” junior ■high schools of New York City. See, The Status of the Public. School Education of Negro and Puerto Rican Children in New York City, presented to the Board of Education Commission on Integration, October, 1955. Prepared by the Public Education Association assisted by the New York University Research Center for Human Relations, requested by Colonel Arthur Levitt, President of the New York City Board of Education.

 The report of this subeommission dated December 7, 1956, was submitted to the Board of Education by the Commission on Integration for its approval and laid over at the meeting of December 27, 1956, for a public hearing on January 17, 1957. The report was accepted and approved by the Board of Education on February 28, 1957. Ibid., pp. 28, 29.

 Ibid., p. 14.

 Ibid., p. 15.

 Cf. Borders v. Rippy (247 F. 2d 268, 272).

 Board of Education data incomplete on 7 of the 127 junior high schools and therefore not included in the analysis.