Vincent A. Lupiano, J.
This is a proceeding under article 78 of the Civil Practice Act, brought by two associate professors at Queens College for an order annulling determinations made by the Board of Higher Education, herein called the respondent, which, in ultimate, refused petitioners promotion to the rank of professor at the college. Petitioners are Roman Catholics, and they allege that they have been denied such promotion, not because of any lack of quality or promise in their records, but solely because of anti-Catholic bias held by college personnel having the power to recommend and make promotions; and that thereby their constitutionally guaranteed civil rights have been illegally invaded. Petitioners further assert that they have no adequate remedy at law for the review and redress of the wrong done them except through this judicial proceeding.
Respondent rejects the imputation of bias and contends, in the main, that this proceeding is improperly brought in that the determinations of the respondent can be adequately reviewed by appeal to the State Commissioner of Education (Education Law, § 310). The allegations set forth in the petition, declares *437 respondent, are concerned exclusively with matters of educational competence, qualification and administration, “ all of which matters are particularly within the expertness, authority and jurisdiction of the State Commissioner of Education ”.
Thus, the issue is joined. Were respondent’s determinations denying petitioners preferment the result of honest evaluations of the objective criteria of professional qualification and competence exclusively, or were they the tainted fruit of judgments distorted by religious bias 1 This is a grave issue. Immediately to mind come the repeated pronouncements of this State, constitutional and statutory, deprecating and interdicting discrimination amongst men because of race, creed, color, religion or national origin (e.g., N. T. Const., art. I, § 11; Penal Law, § 700 et sec[.; Executive Law, § 290 et seq_.). To be noted, also, is the magnitude of the State’s concern and involvement with this evil, because such evil ‘1 not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants ” (Executive Law, § 290). And to divert for a moment, we may recall the recurring desperate attempts in some quarters to justify such discrimination through theological sophistry or spurious esoteric theories of religious, cultural or ethnic superiority.
It is a matter of public knowledge that in the Fall of 1958, following upon the earlier publication of charges of anti-Catholic discrimination in the promotion of members of the instructional staff at Queens College, the State Commission against Discrimination, herein called SCAD, adopted a resolution authorizing the institution of an informal investigation and study of the charges. SCAD completed its investigation in 1960, and the findings of the investigating Commissioner recite, among other things, that: “(a) there has been resistance to the employment and promotion of Catholics in teaching positions at Queens College; (b) key personnel of the College organizational structure have resisted the progress of teachers known by them to be practicing Catholics; (c) a number of specific instances of discrimination against Catholic teachers at Queens College have taken place; (d) the Board of Higher Education and Queens College officials have either been passive, defensive or apologetic with respect to the situations which have led to the existing charges of discrimination against Catholics and that this negative response is not adequate; and (e) the attitudes and actions of the Board and the officials of Queens College do not suggest a strong likelihood that resistance to the employment and pro *438 motion of Catholics in teaching positions at Queens College has been eliminated and will not recur. ’ ’
It is wholly immaterial that SCAD may have pursued unauthorized procedure in conducting its investigation and promulgating its finding (Matter of Board of Higher Educ. of City of N. Y. v. Carter, 16 A D 2d 443). Its findings, nevertheless, have indicated the presence of a serious affair and have offered what might be a discouraging prognosis. But apart therefrom, and instantly controlling, the submission here affords more than a threshold view of a problem which warrants this court’s close attention for the benefit of the accused as well as the accusers.
Certainly, the situation here is a sensitive one, and is peculiarly and incidentally cloaked with a public interest. Therefore, in probing this putative blot on the campus of Queens College, which effort lies within the instant judicial course, one must face the challenge of not losing one’s perspective, and of not letting one’s vision be mesmerized by the massed minutiae ever about. One must shun the accommodative philosophy of inaction so widely held with respect to so-called sensitive or controversial questions. And one must resist the vortex of fear that mortally smothers initiative and stifles honest inquiry and action. The problem is one of emphasis — of the right kind of emphasis. And in this turbulent era of a thousand distractions, the emphasis on the truly essential things is certainly not easy. Nevertheless, we are not excused from making the choice.
For we may recognize that in our daily pursuits we become centrifugal, tending away from the focal, primordial principle, constitutionally enshrined, that men have certain inalienable rights, among which is the right to the exercise and enjoyment of religious profession and worship, freely, without discrimination. This means that men should not be penalized, before the law, because of the quality or character or external expression of their relationship to and with God; provided always, of course, that men’s actions are not licentious or inconsistent with the peace and safety of the body politic. And if the primordial principle is to continue inviolate, mere affirmation, however constant, of its inviolability, and mere espousals, however impassioned, of the brotherhood of men and the oneness of mankind, are not enough. Perpetual vigil must be kept to insure that our deeds square with and mirror our professions and preachments.
The point of emphasis before us, then, is whether this primary constitutional guarantee has been breached. Have these petitioners been penalized because — their inalienable right to do so notwithstanding — they have chosen to worship God as members *439 of their -chosen church. Let us find out, for enough has been indicated to justify review of respondent’s determinations. Hence, this matter of asserted pollution of the academic atmosphere at Queens College shall be aired and reviewed to see whether it does exist and, if so, how has it affected the promotional rights of the petitioners. Thusly, if infection exists, it will be appropriately treated; if it does not exist, the cloud of suspicion and doubt over the integrity of the college administration can be dispelled. For our halls of learning are the intellectual incubators of our citizenry. Their purpose is to discipline the mind and orient it in the direction of truth. Yet, this purpose will be unrealized if preceptors themselves are undisciplined, or if they have allowed virulent irrelevancies to intrude upon and vitiate the sterile processes of clear and responsible thinking.
Careers and reputations are at stake here, not to mention the worth and stability of basic rights. The public mind and heart are ill at ease. The fullness of truth alone will afford the requisite measure of justice and peace.
I see no merit in respondent’s contention that petitioners have an adequate and exclusive administrative remedy in the statutory right of appeal to the State Commissioner of Education. To the contrary, it is well established that the right of appeal to such Commissioner is not exclusive and does not preclude recourse to the courts in any case wherein, as here, it is complained that a party is being deprived of valuable rights in violation of law (Matter of Frankle v. Board of Educ. of City of N. Y., 173 Misc. 1050, mod. 259 App. Div. 1006, affd. 285 N. Y. 541; Matter of Sokolove v. Board of Educ. of City of N. Y., 176 Misc. 1016; Matter of Jacobson v. Board of Educ. of City of N. Y., 177 Misc. 809, mod. 265 App. Div. 837, motion for leave to appeal denied 265 App. Div. 935; Cottrell v. Board of Educ. of City of N. Y., 181 Misc. 645, affd. 267 App. Div. 817, affd. 293 N. Y. 792; Matter of Skipwith, 14 Misc 2d 325, 332; Matter of Coughlan v. Cowan, 21 Misc 2d 667; Matter of Moses v. Board of Educ. of City of Syracuse, 127 Misc. 477, affd. 218 App. Div. 811, reversed on other grounds 245 N. Y. 106; see, also, Matter of O’Connor v. Emerson, 196 App. Div. 807, affd. 232 N. Y. 561; Cannon v. Towner, 188 Misc. 955; Ellis v. Dixon, 118 N. Y. S. 2d 815, affd. on other grounds 281 App. Div. 987; Matter of Botens v. Board of Educ. of Cent. School Dist. No. 1, 26 Misc 2d 158; Matter of Leone v. Hunter, 21 Misc 2d 750). While petitioners may appeal to the State Commissioner of Education before seeking judicial intervention, they are under no compulsion to do so. Violation of basic rights, constitutionally and statutorily *440 based, as here, whenever indicated gives this court jurisdiction and power to review respondent’s action without the prerequisite of taking such appeal.
Therefore, it is evident that the adjudication of this grievance is a matter for the singularly perceptive and procedural competence of the arch protector of our basic rights — the court. There is a triable issue and this court will hear the cause. Trial by jury has also been demanded. The remedy to be fashioned can await the event of trial.