In the Matter of ELIZABETH (SIBA) BAUM, a Child Alleged to be Neglected. JEANNE BAUM, Appellant.

Second Department, January 23, 1978

**APPEARANCES OF COUNSEL**

*William M. Kunstler* for appellant.

*Howard E. Pachman, County Attorney (Anton J. Borovina* and *Richard A. Epstein* on the brief), for respondent.

*Annie Stein* and *Robert Moore* for Kenneth B. Clark and others, *amici curiae.*

## OPINION OF THE COURT

SHAPIRO, J.

In a neglect proceeding pursuant to article 10 of the Family Court Act, the appeal is from an order of the Family Court, Suffolk County, dated May 25, 1976, which found that appellant had withheld her daughter from attending school without just cause or valid reason. We affirm.

### THE ISSUE

We are faced here with an appeal that raises serious issues with respect to the responsibilities and rights of a parent to retain control of the upbringing and education of her child as compared with the responsibility of the State in carrying out its role as *parens patriae* to insure for every child protection of his or her health, safety and welfare and the provision to every minor from 6 to 16 years of age of full time instruction consisting of the course of study prescribed in section 3204 of the Education Law in order to fit him or her to cope with the duties and responsibilities of citizenship and enable him or her to grow into adulthood with the ability to handle the problems which are a concomitant of that status. To further complicate the issues, the disagreement between the parent, Jeanne Baum, the appellant here, and the public school authorities responsible for the initiation of this proceeding to divest the parent of the custody of her 13-year-old daughter, Siba Baum, unless she entered her "in school pursuant to Education Law of the State of New York or the education law of any other state of the United States of America" arose out of an emotion-engendered civil rights issue. It is the appellant's claim that the authorities of Middle Country School District No. 11, Suffolk County, refused to take any remedial action with respect to a complaint she made that her daughter was the victim "of overt or covert racism" arising out of her daughter's American Indian origin and that such refusal or neglect constituted just cause or valid reason for her action in keeping her daughter out of school since the beginning of the fall term in September, 1975.

## THE FACTS AND PRIOR PROCEEDINGS

On June 9, 1975 Siba Baum, attending the seventh grade at Selden Junior High School in Middle Country School District No. 11, Suffolk County, New York, the child who has been found by the Family Court, Suffolk County, to be neglected by her mother, Jeanne Baum, received back from her English teacher, Carol Duarte, a book report she had written dealing with the autobiography of Geronimo, edited by S. M. Barrett. In her report Siba was critical of the way in which Whites had treated Indians, characterizing it as "cruelty". She wrote that "since the white people have been here they have been absolutely inhumane to any other races that have been here", and that she had learned from the book that "white men (i.e., the White editor of the book) can't wright (!) about a Indian's point of view" and that she "would not recommend this book to any one. S. M. Barrett sugars everything over that happened in those times." In returning the report, and in addition to other comments, the teacher wrote the following:

"Siba, you MUST improve your spelling. This could have been an A paper. B

"I agree with your feelings of anger. However I have an uncle who is a Wampanoag Indian and his point of view is that the Indians got what they deserved."

When Siba allegedly asked her teacher why she had written the comment, she was first told "Don't interrupt me, I'm handing out papers." A few minutes later Siba brought the book report up again, asking her what the comment meant. The teacher replied that that was what her uncle had said. Siba then said that her uncle "is a disgrace" and that "Indians should be proud that they are Indians." The teacher then said that Indians on reservations are lazy because they do not get off and get jobs. According to Siba the teacher then talked of the high alcoholic rate of Indians, adding that she had taught Shinnecock Indians and that a lot of them were lazy. This exchange occurred in front of the class. The teacher's response to Siba's statement that Indians should be proud that they are Indians was: "Of course you have a right to be proud. Your mother isn't on a reservation." After the class, Siba testified, she was really angry because her teacher had insulted her and her people. She explained that as a teacher Miss Duarte was supposed to research everything.

Siba continued in school for the balance of the day, but she

fainted when she went to board the school bus at the end of the school day, and when she came out of the faint she found that her arms and a knee were scraped. While there is no evidence in the record that this injury was in any way connected with Siba's confrontation with her English teacher, it clearly added to her mother's unhappiness with the teacher.

When Siba returned home she told her mother what had happened. The mother then called the parents of two other pupils in Siba's English class and asked them to check with their children as to the veracity of Siba's account. When they confirmed her account, she got in touch with the school and the next morning, at 8:00 A.M., she, along with Siba and an older daughter, Brenda, met with the school principal, Mr. Lacina, his administrative assistant, Mr. Lupetin, and Miss Duarte. Mrs. Baum, who is confined to a wheelchair, had a tape recorder in her lap and announced that she was recording the meeting, which she proceeded to do.

After hearing Mrs. Baum's version of what occurred, the principal asked Miss Duarte to reply. Her reply began: "Siba read that comment and just screamed that my uncle was a disgrace. She is the one who said he was a disgrace. I did not say he was ashamed. He is not ashamed of being an Indian. He is ashamed of the atrocities which they committed." Miss Duarte also deplored Siba's characterization of the White man as being "inhumane". She noted that Siba had said that since the White people have been here, they were "absolutely inhumane to any other races that have been here." She said that she had told Siba "that that was a blanket statement, that she couldn't make", but then went on to say that there are some Indians who should be ashamed of themselves, that she happened to know of some on the Shinnecock Reservation where she had worked with "the Superintendent of Schools that have some of those students and some of them are lazy." She denied having said that Indians sat on the reservation drinking. She also said that she had praised Siba's mother for getting off the reservation, working and raising her children. She continued: "I find Siba to be very, very bitter and not open to anybody else's point of view. I don't want to change Siba's point of view, I want her to see other people's. And I've commented on this to her all year long, on her different writings, different things she'll say in class. She just has such a negative attitude about so many things." She then denied "attacking the Indians," and told Mrs. Baum that she thought

she and her daughters were "outstanding", and added that she had "told Siba" this "all year long", adding that she had an etching done by Mrs. Baum's oldest daughter, Norma-Jeanne, hanging in her living room.

In a further exchange, Mr. Lacina, the principal, said, after Miss Duarte admitted having said that there were some lazy Indians: "If you want to stereotype—I think maybe we're getting into sterotyping, which is bad. Maybe that's where the mistake—but, I don't know. I'm trying to figure this out—how it happened. And stereotyping is always dangerous in a classroom." After an interchange between Miss Duarte and Mrs. Baum as to the nature and meaning of the teacher's written comment, Miss Duarte said: "The point I put—the reason I put it down was to make Siba see that not everybody shares her point of view. That really is the only reason I put it down." She added, "but I didn't put it down to attack her, by no means."

Miss Duarte then said, in response to a comment by Mrs. Baum that there was no reason for Siba to feel ashamed of anything: *"And I apologize if she [Siba] has been upset, and if you feel affronted. I did not mean it that way. I don't know how to assure you I didn't, but I did not mean it that way."*

Mr. Lacina then declared that the comment quoting Miss Duarte's uncle was "sterotyping people" and that the last part of her written comment at the end of the book report was wrong. He then concluded: "I think that * * * that should not have been said. I think it does stereotype people". He asked Mrs. Baum if she had any other comment. When she alluded to the verbal comments, Miss Duarte asked: "If I make an apology to Siba in front of the class today, that I did not mean it that way—would that suffice? I will do that. I certainly do not want to upset her." She later added: "Well, I want to apologize because Siba is so upset."

The following comments were then made by Mr. Lacina and Miss Duarte:

"MR. LACINA: Do you feel that it would help by apologizing? Yet, I just don't want you to do this. I have the status of all teachers in the school to keep in mind.

"MISS DUARTE: Well, I don't feel that this is affecting the status of teachers. I feel that I have upset a student in front of other students. She's—she did not take it the way—I did not mean it that way, but she took it that way, and I feel that I owe her an apology in front of the class. Yes, she's very upset.

If I had any idea, I would have apologized yesterday. I had no idea she took it this way.

"MR. LACINA: Would that resolve the thing, you think, in your mind?"

Mr. Lacina then asked Mrs. Baum whether this resolved the matter, explaining that he thought Miss Duarte's last remark on the report "wrong" and that since "the act happened in class, let it unhappen in class"; Mrs. Baum refused to indicate that this was satisfactory to her, or what she thought ought to be done to remedy the situation. Thereupon Mr. Lacina instructed Miss Duarte to go back to the classroom, adding: "Discuss this last statement, indicating that it was probably not the right statement to put down. Go over this report. Try to clear up any misconceptions or misinterpretations that you are able to. If the class wants to discuss it,—I think you should use your professional judgment on how far you should let that go. Try to clear it up. That's my judgment."

At that point Mrs. Baum tossed her verbal bomb, saying: *"I would like that [Siba's report]. If you want to make a copy of it, it's fine with me. Siba is going to be taken out of school."* She added: "Right now. Under the circumstances, I don't feel that it's fair for her to have to be under this pressure."

Further discussion led to Mrs. Baum's complaint that her daughter was "scared to death" of Miss Duarte and had been since the beginning of the semester. She accused the teacher of "absolute hostility towards the students." She also made other charges of misbehavior by Miss Duarte based, apparently, on her strictness. The school officials and Miss Duarte then turned to the fact that Mrs. Baum's removal of Siba that day, June 10, would result in her missing her final examination in her Advanced English class. They pleaded with Mrs. Baum to allow Siba to take her examination. Mrs. Baum finally consented to allow Siba to come in to take her examinations on condition that she take them some place other than in Miss Duarte's class. Siba, speaking through her sister Brenda, said she would accept a suggestion of the administrative assistant about a class discussion of the question of stereotyping of Indians, but that she wanted "an Indian, Yellow Paint, or Vernon Perkins or myself [Brenda] to speak to the class, because of Miss Duarte's attitude." To this the principal replied: "A fine educational experience there." Siba then went to school for the balance of the day on June 10.

The next day, June 11, 1975, Siba went to school for part of

the day, but Mrs. Baum, after calling the principal to advise him of what she was doing, sent her daughter Brenda to pick up Siba and remove her from the school at some time before the regularly scheduled close of the school day. This action was taken because Siba, on June 10, had come home and told her that she had been told by two or three children what Miss Duarte had said in class.

While the record contains no testimony by either Siba or Mrs. Baum as to the nature of the apology which Miss Duarte had volunteered to make to the class, Miss Duarte described it as follows in her testimony at the hearing in the Family Court: "I left the office and I went to class and I told the students that if I had ever said anything in class to insult or hurt any of them, I wanted to apologize. I told them that it was finals, they would be taking their final for the day, but they might not take the second part of it on another day because we would have guest speakers who would be Indians, and tell us what Indians' life was like, and life was like on a reservation, and not to worry about their final, that they would not be penalized."

Apparently, Mrs. Baum, who views herself as a Blackfoot Indian since she had learned as a child that she had a Blackfoot in her ancestral line, found that apology completely inadequate.

To detail all that happened thereafter would only extend this already lengthy opinion. It suffices for present purposes to state that it is clear from the entire record that appellant's purpose in keeping her daughter out of school was motivated by a desire to compel (1) the authorities to place in their curriculum programs in the school district on the question of the Indian problem and (2) the issuance by the school district of a policy statement that racism in any form would not be tolerated and, further, that a steering committee be set up from within the school district which would also have on it a member of the Human Rights Commission, and possibly a member of the community, to implement that policy.

That appellant intended to keep her daughter out of school no matter what happened, unless her demands were met, is made clear by her statement at the conclusion of the very first meeting with the principal when she said "Siba is going to be taken out of school." Her purpose in that regard is made even clearer by her testimony in the Family Court, where she said: "Because it was the only way I could dramatize what was

happening at that school. For me to send her back to that school would be to say it's all right, go ahead, you can do it, I'm licked. You have, you know, you have thwarted me at every turn. This was the only way I could dramatize what was happening and I could not send her back to be a party to what was happening because I firmly believe that if racism is ignored or condoned or ignored or neglected it's tantamount to endorsing or condoning it and I don's care what color we are talking about."

I agree with the conclusion of the Family Court Judge in this case, who said:

"[W]e think there's been little judgment used by Mrs. Baum throughout this whole thing. It's rather obvious to us that she seeks martyrhood, that this whole thing has been an opportunity to give her a day in the sun. We think, as we said in our decision, that Mrs. Baum's actions, in great part, precipitated where we are now. * * *

"In our mind, when she [the appellant] went to school that day with a tape recorder, that was the end of any chance of this matter to be resolved."

While every right thinking person must deplore any use of racist stereotyping by a teacher, there are legitimate ways of stopping such conduct. Taking the law into one's own hands to remedy such a wrong is not, however, the right or proper way (cf. *Matter of Cavanagh v Galamison,* 31 AD2d 635, 636). We cannot approve or sanction a parent's defiance of our complusory school attendance law as a means of compelling a school system to change the kind of education made available to its students, provided its procedures comply with the applicable law. As this court noted in *Matter of Oliver v Donovan* (32 AD2d 1036, 1037) "parents do not enjoy a general power of supervision over the school authorities." Before a parent may use the device of removing a child from public school in defiance of the compulsory school attendance law in order to compel the public school system to accept some alteration the parent may believe necessary in the operation of the school system, the parent should be certain that he or she can establish either that the child will receive alternative schooling which meets the requirements of the State Education Law (*Matter of Franz,* 84 Misc 2d 914; *Matter of Thomas H.,* 78 Misc 2d 412), or that to send the child to school would, in the circumstances, imperil the health or safety of the child (*Matter of Richards,* 166 Misc 359, affd 255 App Div 922; see, also,

*Matter of Oliver v Donovan, supra,* p 1037). A child may not be used as a pawn in a battle by a parent with public school authorities. While one can understand, and even agree with, appellant's desire to identify with the cause of the only truly native American, the American Indian, who has without question a justifiable cause for complaint at the treatment he has received at the hands of his White brethren, that desire may not be accomplished at the expense of interference with and the sacrifice of the education needed by her daughter.

The isolated incidents involving Siba's teacher did not suffice to establish that the district maintained a policy of denial of civil rights or of discrimination based on race as was the case in *Matter of Skipwith* (14 Misc 2d 325), where the court found as a fact that a group of parents who had removed their children from public schools which were racially segregated and clearly educationally inferior to other schools in the New York system rather than subject them to discriminatorial inferior education, had a valid defense to a proceeding to declare their children neglected.

Since the appellant conceded on the trial that she was keeping Siba out of school without giving her the education required to meet the minimum standards prescribed by the Education Law (§ 3204, subd 3, par a, cl [1]) the order of the Family Court finding Siba to be a neglected child under the provisions of section 1012 of the Family Court Act must be affirmed.

TITONE, J. P., SUOZZI and O'CONNOR, JJ., concur.

Order of the Family Court, Suffolk County, dated May 25, 1976, affirmed, without costs or disbursements.